AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

OCT 25 2019

CENTRAL DISTRICT OF CALIFORNIA
BY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

532 West 21st Street, San Pedro, CA 90731

Case No. 19-

19 J 04549

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | 18 U.S.C. §§ 922(g) (felon in possession of a firearm) and 924(c) (possession of a firearm in furtherance of drug trafficking) and 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy) |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

Applicant's signature

Nam Cho, Special Agent, ATF

Printed name and title

Sworn to before me and signed in my presence.

CHARLES F. EICK

Date: _____ 10/25/2019 _____

Judge's signature

City and state:  Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge

Printed name and title

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

532 West 21st Street, San Pedro, CA 90731 (the SUBJECT
PREMISES). The SUBJECT PREMISES is part of a two-story duplex-
style structure, with a tan exterior and a low red brick wall in
the front of the structure with a black gate. The doorway to
the SUBJECT PREMISES is on the right/easterly side of the duplex
entrance on the ground level, and SUBJECT PREMISES is on the
upper floor of the structure.

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) and 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

over applications and social media, and photographs) pertaining
to, obtaining, possessing, using, applications for, or
transferring money over $1,000, such as bank account records,
cryptocurrency records and accounts;

   f. Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators, sources of supply of
controlled substances or firearms, or drug or firearms
customers, including calendars, address books, telephone or
other contact lists, pay/owe records, distribution or customer
lists, correspondence, receipts, records, and documents noting
price, quantities, and/or times when drugs, guns, or ammunition,
were bought, sold, or otherwise distributed, whether contained
in hard copy correspondence, notes, emails, text messages,
photographs, videos (including items stored on digital devices),
or otherwise;

   g. Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

   h. Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

     i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

     j.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

     k.    Contents of any calendar or date book;

     l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

     m.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     n.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

     i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.    evidence of the times the device was used;

      vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.     records of or information about Internet Protocol addresses used by the device;

      ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

4.   In searching digital devices (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

   b. The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

    i. The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

    ii. The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

    iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

   c. If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device

pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

      d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

      f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

      g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Nam Cho, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant for FABIAN CASTELLON ("CASTELLON"), for a violation of Title 18, United States Code, Section 922(g)(1): Felon in Possession of a Firearm and Ammunition.

2.    This affidavit is also made in support of an application for warrants to search 532 West 21st Street, San Pedro, CA 90731 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of CASTELLON, as described more fully in Attachment A-2.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) and 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth

all of my knowledge of, or investigation into, this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.   BACKGROUND OF AFFIANT

5.   I am a Special Agent with the Bureau of Alcohol,
Tobacco, Firearms, and Explosives ("ATF"), and have been so
employed since August of 2016.  I am currently assigned to the
Los Angeles Field Division's Glendale Office, which conducts
investigations into violations of federal firearms laws.  I
received basic training at the Criminal Investigator Training
Program and the ATF Academy at the Federal Law Enforcement
Training Center in Glynco, Georgia.  Prior to my employment with
ATF, I was a Patrol Officer with the Newton Police Department in
the city of Newton, Massachusetts from 2013 to 2016.  I have
experience in conducting physical surveillance, executing search
and arrest warrants, participating in controlled drug/gun
purchase operations using informants, and conducting interviews.
I have also participated in numerous investigations involving
violations of federal firearms and drug laws.

## III.  SUMMARY OF PROBABLE CAUSE

6.   On August 7, 2019, members of the Los Angeles Police
Department ("LAPD") Harbor Area Narcotics Enforcement Detail
("NED") and ATF Special Agents conducted surveillance at
CASTELLON's residence in San Pedro (the SUBJECT PREMISES),
seeking to arrest him on an active arrest warrant.  When NED
officers saw CASTELLON exit the SUBJECT PREMISES, uniformed

officers approached CASTELLON, who attempted to flee.  CASTELLON
was arrested after a short foot chase, and officers discovered
an empty handgun holster on his person and quantities of various
separately-packaged narcotics in a bag CASTELLON was carrying.
NED Officers obtained a state search warrant for the SUBJECT
PREMISES, and found a loaded, 9mm handgun, 19 rounds of 9mm
ammunition, and drug distribution paraphernalia.  In a
Mirandized interview, CASTELLON admitted that the drugs,
ammunition, and gun belonged to him.  CASTELLON was released by
state authorities and has failed to report to his probation
officer.  Subsequent to CASTELLON's release, on or about October
20, 2019, a confidential source (the "CS") informed LAPD that
CASTELLON has returned to the SUBJECT PREMISES and is again
residing there, and that CASTELLON is again in possession of a
firearm.  CASTELLON is a convicted felon.

### IV.   STATEMENT OF PROBABLE CAUSE

7.   Based on my review of law enforcement reports,
recorded interview footage, conversations with other law
enforcement agents, and my own knowledge of the investigation, I
am aware of the following:

### A.   Surveillance and Arrest of CASTELLON and Discovery of a Firearm Holster and Narcotics

8.   On August 7, 2019, NED officers and ATF Special Agents
conducted a surveillance operation to locate CASTELLON.  NED and
ATF were aware that CASTELLON had an active arrest warrant for a
violation of 3000.08(c) of the California Penal Code (relating
to parole revocations), and were attempting to locate CASTELLON

in order to place him under arrest.  Based on California
Department of Motor Vehicles records and parole and probation
records for CASTELLON, NED Officer Castruita determined that
CASTELLON resided at 532 West 21st Street, San Pedro, CA 90731
(the SUBJECT PREMISES), and NED and ATF established an
observation post and conducted surveillance at that location.

9.    At approximately 5:00 p.m., NED Officer Makari saw
CASTELLON leave the SUBJECT PREMISES and approach a black
motorcycle parked on the street in front of the SUBJECT
PREMISES.  NED Officer Makari directed uniformed officers to
approach CASTELLON and place him under arrest.  As the uniformed
officers approached him, CASTELLON fled, running to the rear of
the SUBJECT PREMISES, where he jumped over a wall into an
adjoining property east of the SUBJECT PREMISES, and continued
to run into an alley directly behind the SUBJECT PREMISES.  LAPD
and NED officers pursued CASTELLON, and LAPD Detective Zamora
and Officer Castruita placed him custody.

10.    Once CASTELLON was seized and placed under arrest,
Officer Castruita conducted a pat-down of CASTELLON and
discovered an empty black handgun holster attached to
CASTELLON's belt.  Officer Makari searched a black drawstring-
style bag CASTELLON was carrying and discovered a glass pipe
containing an off-white substance resembling methamphetamine
residue, approximately 7.13 gross grams of a substance
resembling methamphetamine, approximately 7.89 gross grams of a
black tar like substance resembling heroin, and approximately
2.55 gross grams of Alprazolam pills.  All three drugs were

separately contained in clear plastic bags.  Officer Makari also discovered a black cell phone on the ground where CASTELLON had been seen before he fled from the officers.[1]

B.   The SUBJECT PREMISES is Searched Pursuant to a State Search Warrant, and Law Enforcement Find a Firearm, Ammunition, and Drug Paraphernalia

11.  Based on the empty handgun holster found on CASTELLON, officers conducted a protective sweep of the area, including the SUBJECT PREMISES, but did not locate the missing firearm.

12.  NED Officer Castruita then applied for and obtained a state search warrant for the SUBJECT PREMISES, as well as a 2016 Yamaha motorcycle and vehicles connected to the occupants or permanent residents of the location.  This warrant was signed by the Honorable Peter Mirich, of the Los Angeles County Superior Court.

13.  During the execution of the state search warrant, Officer Castruita discovered a Canik model TP9SF 9mm pistol, bearing serial number 17AT03780, loaded with 19 live rounds of 9mm ammunition, in a couch in the living room of the SUBJECT PREMISES.  Officer Makari discovered a digital scale that contained a brown tar like residue resembling heroin in the living room of the SUBJECT PREMISES.  Detective Hayes discovered a spent 9mm shell casing behind a couch in the living room of the SUBJECT PREMISES.

---

[1] The United States attempted to obtain a search warrant to search this phone.  That warrant application was denied by the Honorable Steve Kim, United States Magistrate Judge, on or about October 09, 2019.

14.   Two other occupants of the SUBJECT PREMISES, Fabiola Castellon and Wilfredo Castellon, advised Detective Zamora that CASTELLON slept in the living room of the SUBJECT PREMISES, kept his property there, and did not have access to the other rooms.[2] When Detective Zamora inquired if they had knowledge of a firearm in the SUBJECT PREMISES, Fabiola and Wilfredo denied having knowledge of the firearm found in the SUBJECT PREMISES.

C.   **Mirandized** Interview of CASTELLON

15.   After CASTELLON was arrested and transported to Harbor Station, Officer Makari read him his Miranda rights, which CASTELLON stated he understood.  Officer Makari then conducted a custodial Mirandized interview.

16.   During the interview, when asked about the narcotics, CASTELLON admitted to being in possession of the heroin, methamphetamine, and Alprazolam (commonly known as Xanax).  When asked about the quantities of heroin, CASTELLON responded that he had about 6 grams, and when asked about the methamphetamine, CASTELLON responded that he had 10 grams, stating that it was for his own personal use.

---

[2] While these other occupants stated on August 7, 2019 that CASTELLON did not have permission to access to parts of the SUBJECT PREMISES other than the living room, this application requests permission to search the entirety of the SUBJECT PREMISES, because I believe that after the discovery of a handgun in the living room of the SUBJECT PREMISES on August 7, 2019, CASTELLON is likely to gain access to and attempt to hide evidence in other parts of the SUBEJCT PREMISES to avoid detection.  The other occupants admitted to being unaware of the handgun found in the SUBJECT PREMISES on August 7, 2019, leading me to believe that CASTELLON has been hiding contraband in the SUBJECT PREMISES without the other occupants' knowledge, and may have hidden contraband in rooms other than the living room without their knowledge as well.

17.   CASTELLON admitted to possessing the Canik pistol found in the SUBJECT PREMISES for approximately one to two weeks.  When asked about why he had tried to run from the officers, CASTELLON stated he believed he had the gun on him. Officer Makari asked CASTELLON how many times he had fired the Canik pistol and referenced the spent shell casing found in the living room.  CASTELLON denied having fired the Canik pistol found in SUBJECT PREMISES, and stated that the spent shell casing found in the living room was from a different 9mm firearm he previously possessed.  CASTELLON stated that he had discharged that other firearm inside the SUBJECT PREMISES approximately one month earlier, on or about July 4, 2019. Officer Makari then asked CASTELLON for details regarding the other firearm he had fired on the Fourth of July.  CASTELLON stated the brand was scratched off and he had the firearm in his possession for approximately two weeks before selling it for $50 in profit.

**D.    CS reported that CASTELLON has Returned to the SUBJECT PREMISES and Possesses another Handgun**

18.   Based on my review of law enforcement reports and my conversations with LAPD NED Officers, I know the following:

a.   After CASTELLON's Mirandized interview, he was booked into jail, transferred into the custody of the Los Angeles County Sheriff's jail, before being released and instructed to report to his parole officer.  CASTELLON failed to report to his parole officer as directed, and went into hiding.

b.   On or about October 20, 2019, a confidential source (the CS)[3] reported to NED that CASTELLON had returned to the SUBJECT PREMISES, and again was in possession of a firearm, this time, a revolver.  The CS did not know CASTELLON by last name, but referred to him as Fabian who lives on 21st Street, and knew of him based on CASTELLON's reputation and because CASTELLON lived at the SUBJECT PREMISES.

c.   According to parole records, CASTELLON identified the SUBJECT PREMISES as his residence and did not change his listed residence after his arrest on August 7, 2019.

**E.   CASTELLON's Prior Felonies**

19.   On or about August 16, 2019, I reviewed certified conviction documents for CASTELLON and learned that CASTELLON has been previously convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about August 5, 2007, in the Superior Court of the State of California, County of Los Angeles, Case Number NA074916, CASTELLON was convicted on one count of violating California Penal Code Section 245(a)(1), Assault with a Deadly Weapon and one count of violating California Health and Safety Code Section 11377(a), Possession of Methamphetamine.

---

[3] The CS has not provided information the LAPD previously, and his information regarding CASTELLON could not be independently verified.  However, the CS's report is corroborated in part by CASTELLON's previous arrest at the SUBJECT PREMISES and admission that he possessed a firearm at the SUBEJCT PREMISES.  The CS provided this information after his own arrest on an unrelated narcotics charge, and has not received any benefit for providing this information at this time.

b.    On or about May 14, 2009, in the Superior Court of the State of California, County of Los Angeles, Case Number NA081951, CASTELLON was convicted of violating California Penal Code Section 12021(a)(1), Felony Possession of a Firearm by a Person who has a Previous Felony Conviction or Who is Addicted to the Use of any Narcotic Drug.

c.    On or about July 25, 2012 in the Superior Court of the State of California, County of Los Angeles, Case Number NA091830, CASTELLON was convicted of violating California Penal Code Section 211, Robbery.

## V.  INTERSTATE NEXUS

20.   Based on my review of a September 18, 2019 report by ATF Special Agent Lewis Rohrer, I know the following:

a.    The Canik model TP9SF pistol, bearing serial number 17AT03780, recovered from the SUBJECT PREMISES, was manufactured in Turkey and necessarily moved in foreign commerce;

b.    Eighteen of the 9mm rounds recovered from the SUBJECT PREMISES were manufactured in Arkansas and necessarily moved in interstate commerce; and one of the 9mm rounds recovered from the SUBJECT PREMISES was manufactured in Russia and necessarily moved in foreign commerce.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

21.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

     d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

     e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

     f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

     g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

     h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and

suppliers.   These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

22.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between

persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

**VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]**

23.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. REQUESTED ORDERS

### A.   Night Service

26.  I request that the Court authorize investigators to serve this warrant during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime service exists because, as discussed above, CASTELLON has admitted to possessing at least two firearms in the past four months, and reportedly possesses another firearm at this time, and he has been convicted of multiple violent felonies. If law enforcement were to execute this warrant during the daytime, it would potentially endanger law enforcement as they will lose the element of surprise, and increases the risk of flight, and movement and/or evidence destruction sought through the search warrants.

27.  Law enforcement has also conducted surveillance on the SUBJECT PREMISES since the report by the CS, which has shown that the black motorcycle believed to belong to and be used by CASTELLON has been gone from the SUBJECT PREMISES during daytime hours, and typically only present at night, leading me to

believe that CASTELLON is present at the SUBJECT PREMISES primarily at nighttime hours.

### X.   CONCLUSION

28. Based on the above, I submit there is probable cause to believe that on or about August 7, 2019, CASTELLON committed a violation of Title 18, United States Code, Section 922(g)(1): Felon in Possession of a Firearm.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the person of CASTELLON described in Attachment A-2.

/s/
_____
Nam Cho, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed to and sworn before me
this 25th day of October, 2019.

CHARLES F. EICK
_____
THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE